ROBERTS, J., for the Court:
 

 ¶ 1. A jury sitting before the Bolivar County Circuit Court found Robert Porter guilty of murder and simple assault. The circuit court found that Porter qualified for enhanced sentencing as a habitual offender pursuant to Mississippi Code Annotated section 99-19-81 (Rev.2007). Accordingly, incident to Porter’s murder conviction, the circuit court sentenced Porter to life in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole or probation. As for Porter’s simple-assault conviction, the circuit court sentenced Porter to six months in custody. Additionally, the circuit court set that sentence to run consecutively to Porter’s sentence for murder. Aggrieved, Porter appeals and claims the evidence is insufficient to sustain his convictions for murder and simple assault. Alternatively, Porter argues that the evidence merely supported a manslaughter conviction, rather than a conviction for murder. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. The events that led to Porter’s incarceration were set into motion in a club in Choctaw, Mississippi. On April 7, 2007, Porter went to a club described in the record as both “Clea’s Place” and “the L.A. Connection.” Once inside, Porter saw that his estranged wife, Rosemary Porter, and a male friend, Terry Moore, were sitting together.
 
 [1]
 
 According to Rosemary, she and Terry did not have a romantic relationship, although she testified that she “used to court” Terry approximately seventeen years earlier.
 

 ¶ 3. Rosemary later testified that Porter walked up to the table where she and Terry were sitting together. Rosemary testified that Porter said, “[djidn’t I tell you, both of you, if I had [sic] caught y’all together I would kill both of you[?]” Terry’s nephew, Wendall Taylor, testified that he was sitting with Rosemary and Terry. Wendall corroborated Rosemary’s testimony regarding the substance of Porter’s statement. According to Wendall, Porter said, “didn’t I tell you that if I catch both of y’all together[,] I’m going to kill you and him[?]”
 

 
 *537
 
 ¶ 4. Rosemary testified that Porter then left the club and returned a short time later. According to Rosemary, upon reentering the club, Porter walked up to the table where she and Terry were sitting and stabbed Terry once. She testified that Terry never moved before Porter stabbed him. After being stabbed in the chest, Terry managed to get up from his chair. He grabbed a bottle from a nearby table, but he collapsed shortly afterward. The knife penetrated Terry’s right lung and punctured his heart. Terry died at the scene. Porter later claimed that he thought Terry was going to attack him. In other words, Porter claimed he was acting in self-defense.
 

 ¶ 5. According to Rosemary and Wen-dall, Porter attacked Rosemary after he had stabbed Terry. Rosemary testified that Porter said, “I’m going to kill your M.F. butt, too” and tried to cut her with the knife. Rosemary “threw her left arm up” and “kicked [Porter] off of her.” Porter then ran out of the club. Rosemary had a wound on her arm, but she did not receive medical attention. She later testified that Porter had cut her with a knife. However, Porter claimed that he had merely grabbed Rosemary and that his fingernail caused the wound on her arm.
 

 ¶ 6. Jeff Joel, an investigator with the Bolivar County Sheriffs Department, was dispatched to the club at approximately 11:45 p.m. Investigator Joel found no weapons near Terry. Neighboring authorities were informed to be on the lookout for Porter.
 

 ¶ 7. Officers with the Ruleville, Mississippi Police Department found Porter at a gas station. He was sleeping inside his car. He was also “highly intoxicated,” according to the description by Officer Arthur Coleman of the Ruleville Police Department. Deputy Mark Carpenter went to the gas station in Ruleville. Deputy Carpenter read Porter his rights and placed Porter in the back of his patrol car. According to Deputy Carpenter, he did not ask Porter any questions. Deputy Carpenter testified at Porter’s trial. Deputy Carpenter testified that, without any prompting from him, Porter spontaneously told him that he had told Rosemary and Terry that he would kill them if he caught them together. According to Deputy Carpenter, Porter then asked whether Terry was dead. Deputy Carpenter told Porter that Terry had died. Porter then said, “it served the son of a b-right,” and “it was too bad he didn’t kill the b-, too.”
 

 ¶ 8. On March 19, 2008, Porter was indicted for murder and aggravated assault. Additionally, the indictment contained an allegation that Porter was a habitual offender. On May 12, 2008, Porter’s trial commenced. The prosecution called six witnesses. Rosemary and Wendall testified regarding the events that occurred at the club. Investigator Joel, Officer Coleman, and Deputy Carpenter testified regarding their participation in the investigation and Porter’s apprehension. Deputy Carpenter also testified regarding Porter’s unprompted statements. Dr. Steven T. Hayne, a forensic pathologist, testified regarding the autopsy he performed on Terry’s body.
 

 ¶ 9. After the prosecution rested its case-in-chief, Porter chose to testify. Porter testified that he acted in self-defense when he stabbed Terry. He also testified that he did not attack or cut Rosemary with a knife. Porter’s precise testimony will be discussed in greater depth in the analysis portion of this opinion.
 

 ¶ 10. As previously mentioned, the jury found Porter guilty of murder. The jury did not find Porter guilty of the aggravated assault of Rosemary. Instead, they found him guilty of the lesser-included of
 
 *538
 
 fense of simple assault. During a bifurcated proceeding, the circuit court found the prosecution sufficiently demonstrated that Terry qualified for enhanced sentencing as a habitual offender pursuant to section 99-19-81.
 
 [2]
 
 For Terry’s murder, the circuit court sentenced Porter to life in the custody of the MDOC without eligibility for parole or probation. For the simple assault of Rosemary, the circuit court sentenced Porter to six months in custody, with the sentence to run consecutively to Porter’s life sentence for Terry’s murder. Following his unsuccessful post-trial motions for a judgment notwithstanding the verdict (JNOV) or, alternatively, for a new trial, Porter appeals.
 

 ANALYSIS
 

 SUFFICIENCY OF THE EVIDENCE
 

 ¶ 11. Porter claims the circuit court erred when it denied his post-trial motion for a JNOV. Within that motion, Porter’s generalized argument was simply that a JNOV was appropriate. Otherwise, Porter based his post-trial motion on “[a]ny and all other errors apparent on its face in the record.” Porter did not specify any of the circuit court’s rulings that he considered to be erroneous. Likewise, he did not specify what he considered to be a deficiency in the proof, or what elements of which charge that he considered to have been insufficiently demonstrated.
 

 ¶ 12. A motion for a JNOV must be specific regarding the movant’s challenge of the sufficiency of the evidence.
 
 Jordan v. State,
 
 936 So.2d 368, 372 (¶ 20) (Miss.Ct. App.2005). When a movant fails to specify how the evidence was insufficient, we will not find that the circuit court erred in denying a motion for a JNOV.
 
 Id.
 
 Porter’s generic and conclusory argument that a JNOV was appropriate does not rise to the standard of specificity. It is no great challenge to argue something more than a generic argument. Simply stating that there was insufficient evidence of premeditation and then highlighting the deficiency with portions of the testimony would suffice. In any event, Porter’s motion was overly generalized. Accordingly, Porter is procedurally barred from raising this issue on appeal. Procedural bar notwithstanding, we also find no merit to his argument on appeal.
 

 ¶ 13. Regarding the standard of review incident to claims such as the ones Porter raises in this issue, the Mississippi Supreme Court has held as follows:
 

 [I]n considering whether the evidence is sufficient to sustain a conviction in the face of a motion for ... [JNOV], the critical inquiry is whether the evidence shows beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction. However, this inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the
 
 *539
 
 crime beyond a reasonable doubt. Should the facts and inferences considered in a challenge to the sufficiency of the evidence point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty, the proper remedy is for the appellate court to reverse and render. However, if a review of the evidence reveals that it is of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense, the evidence will be deemed to have been sufficient.
 

 Bush v. State,
 
 895 So.2d 836, 843 (¶ 16) (Miss.2005) (citations and internal quotations omitted). Porter claims there was insufficient evidence of murder as well as insufficient evidence of simple assault.
 

 1. MURDER
 

 ¶ 14. On appeal, Porter presents a two-fold argument. First, Porter claims that the circuit court should have found that the evidence was insufficient to sustain a conviction for murder and should have then granted a judgment of acquittal. Alternatively, Porter argues that the evidence only supported a conviction for manslaughter, rather than murder.
 

 ¶ 15. To sustain a conviction for murder, the prosecution was obligated to prove, beyond a reasonable doubt, that Porter killed Terry, that he did so without authority of law, and that he did so with the deliberate design to effect Terry’s death. Miss.Code Ann. § 97 — 3—19(l)(a) (Rev.2006). As previously mentioned, Porter first claims that there was insufficient evidence of murder because he was acting in self-defense. Porter relies on his own testimony to bolster his argument. Porter claimed that he was afraid of Terry. According to Porter, he and Rosemary had an argument three weeks before he killed Terry. Porter testified that, during that argument, Rosemary, her nephew, and Terry “jumped” him and “beat” him. Porter testified that he filed charges against Terry, and as a result, Terry “had it out” for him. Additionally, Porter testified that when he confronted Rosemary and Terry, Terry had his hands inside the pockets of his nylon windbreaker jacket. According to Porter, Terry “was fumbling trying to get [his hands] out of [his pockets].” Porter testified that he said “[d]on’t do that” to Terry, but Terry “was still trying to come up with something out of his coat.” Porter went on to testify that Terry “kept coming up, and he was coming up. Once he got to a certain point, he was coming up gradually. I just — I just stuck him.”
 

 ¶ 16. Porter later testified that he was “scared” of Terry and that Terry’s “[r]eaching for a weapon had [him] scared.” Porter also testified that he never saw Terry with a weapon, but he insisted that he knew that Terry carried one. During his redirect testimony, Porter testified that he “was afraid [Terry] had something — you know he could do something.”
 

 ¶ 17. However, the record contains evidence that contradicted Porter’s version of events. Rosemary testified that Porter entered the club, approached her and Terry, and then said — “[d]idn’t I tell you, both of you, if I had [sic] caught y’all together I would kill both of you[?]” Terry’s nephew, Wendall, testified that he was sitting with Rosemary and Terry. Wendall testified that Porter approached their table and said, “didn’t I tell you that if I catch both of y’all together[,] I’m going to kill you and him[?]” Porter did not dispute that he
 
 *540
 
 said something to Rosemary and Terry. However, Porter testified that he said, “I told you I didn’t want to catch y’all together anymore ‘cause [sic] I don’t want to be — I don’t want to be responsible for my actions.” Later, he testified that he said, “I catch y’all together, I’m not responsible for my actions.” Viewing the evidence in the light most favorable to the prosecution, the jury could have found that Porter was reminding Rosemary and Terry of his threat to harm them.
 

 ¶ 18. Additionally, it was undisputed that Porter approached Rosemary and Terry. They did not approach him. Rosemary testified that Porter entered the club, spoke to them, left the club, re-entered, and immediately walked up to Terry and stabbed him without any provocation. Rosemary also testified that Terry never moved toward Porter. She testified that Terry “wasn’t doing [anyjthing with his hands.” She also testified that Terry “didn’t have [anything in his hands.” Additionally, she testified that Terry was sitting down at the table and that he had his hands in his lap. When asked whether Terry made “any kind of motion or anything, as if to attack Mr. Porter,” Rosemary responded, “[n]o, ma’am.” Wendall corroborated Rosemary’s testimony. Wendall testified that Porter stabbed Terry before Terry even reacted. Wendall also testified that: Porter and Terry did not argue; Terry did not have a weapon; and Terry did not make any aggressive movements toward Porter. Finally, Investigator Joel testified that there was no weapon on or near Terry when Investigator Joel arrived at the club. Considering Rosemary’s, Wendall’s, and Investigator Joel’s testimonies in the light most favorable to the prosecution, the jury could have concluded that Porter did not act in necessary self-defense when he stabbed Terry. In the same light, the jury could have found that Porter stabbed Terry with deliberate design to kill him.
 

 ¶ 19. Additionally, Deputy Carpenter testified that, without any provocation, Porter told him that he intended to kill both Terry and Rosemary. Deputy Carpenter also testified that, upon learning that Terry died as a result of the stab wound, Porter said, “it served the son of a b-right.” The jury was also within its discretion in finding Porter less credible than other witnesses. Porter testified that he always carried a knife with him because he used the knife when he was working on cars. However, Porter also testified that he had not been working on cars that day. Furthermore, Porter once testified that “[t]hey” say he killed Terry, implying that the claim he killed Terry was unfounded. However, he quickly clarified that he, in fact, had killed Terry. Additionally, Porter’s version of events fluctuated at trial. First, Porter testified that he stabbed Terry because Terry’s “[r]eaching for a weapon had [him] scared.” At another point, Porter testified that he never saw Terry with a weapon, but he assumed Terry had one because Terry had his hands in his pockets. At yet another point, Porter testified that he “didn’t realize that [he] had stabbed a man.” When asked to clarify, Porter relaxed his position and testified that he did not know that he had stabbed Terry “that bad.” When asked to further clarify, Porter testified that he was “saying [he] didn’t have [any] control of it at that time” because his “emotions alone” were controlling him. However, immediately afterward, Porter testified that he “was just moving [and that he] didn’t have any emotions.” Based on Porter’s various and wildly fluctuating version of events, the jury could have found that he was not credible, and/or he was attempting to be evasive with his responses during cross-examination.
 

 
 *541
 
 ¶ 20. What is more, Rosemary testified that Porter entered the club, saw her and Terry, reminded them that he had previously said he would kill them if he saw them together, and exited the club before he returned and stabbed Terry. The jury could have found that Porter left the club to arm himself. Deliberate design “may be formed quickly and perhaps only moments before the act ... [and] ... may be inferred through the intentional use of any instrument which based on its manner of use is calculated to produce death or serious bodily injury.”
 
 Wilson v. State,
 
 936 So.2d 357, 364 (¶ 17) (Miss.2006).
 

 ¶ 21. Considering the volume of testimony described above, the jury was well within its discretion to find Porter guilty of Terry’s murder. The jury acted within its discretion when it discounted Porter’s various versions of events. The circuit court was within its own discretion to find that a rational trier of fact could have found that the prosecution proved that Porter was guilty of murder beyond a reasonable doubt. It follows that we find no merit to this argument.
 

 2. SIMPLE ASSAULT
 

 ¶ 22. Next, Porter claims the circuit court erred when it failed to find that there was insufficient evidence to sustain his conviction for the simple assault of Rosemary. To sustain a conviction for simple assault, the prosecution was obligated to prove, beyond a reasonable doubt, that Porter “(a) attempted] to cause or purposely, knowingly or recklessly eause[d] bodily injury to another; or (b) negligently cause[d] bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; or (c) attempted] by physical menace to put another in fear of imminent serious bodily harm.” Miss.Code Ann. § 97-3-7 (Supp.2009).
 

 ¶ 23. Rosemary testified that Porter attacked her with a knife immediately after he had stabbed Terry in the chest. According to Rosemary, Porter said, “I’m going to kill your M.F. butt, too” as he tried to cut her. Wendall corroborated Rosemary’s testimony in that he testified Porter attacked her with a knife after he had stabbed Terry. Rosemary testified that Porter cut or stabbed her upper left arm. Porter, however, testified that he merely grabbed Rosemary, and because he had long fingernails, one of his fingernails cut into her arm. The jury saw a photograph of Rosemary’s bleeding left arm. That photograph was taken the night Porter killed Terry. Viewing the evidence in the light most favorable to the prosecution, we find that the evidence was legally sufficient to support the conviction of the simple assault against Rosemary. It follows that we find no merit to this issue.
 

 ¶ 24. THE JUDGMENT OF THE BOLIVAR COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, MURDER, AND SENTENCE AS A HABITUAL OFFENDER OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT THE ELIGIBILITY FOR PAROLE OR PROBATION, AND COUNT II, SIMPLE ASSAULT, AND SENTENCE OF SIX MONTHS IN THE BOLIVAR COUNTY JAIL TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT I, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO BOLIVAR COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE AND MAXWELL, JJ„ CONCUR.
 

 [1]
 

 . Rosemary testified that she and Porter had been separated for six months at the time. Porter testified that they were merely living in separate places due to financial issues. It is undisputed that they were not living together at the time.
 

 [2]
 

 . The prosecution demonstrated that Porter had the following prior felony convictions in Florida: (1) aggravated assault in 1973; (2) uttering a forgery in 1973; (3) “aggravated battery” in 1977; (4) aiding an escape in 1977; (5) sexual battery in 1980; (6) "aggravated battery” in 1981; and (7) possession of a firearm by a previously-convicted felon, also in 1981. Additionally, the prosecution demonstrated that, in Mississippi, Porter had pled guilty to a fourth offense of driving under the influence in 1992. Each of the eight convictions were felony convictions.